## FLINN et al. v. INTERSTATE BUILDING & LOAN ASS'N OF ATLANTA, GA.

### SCOTT v. EARLE et al.

(Circuit Court, D. South Carolina. November 17, 1905.)

BUILDING AND LOAN ASSOCIATIONS—INSOLVENCY—SETTLEMENT WITH BORROWING STOCKHOLDERS.

Defendants were borrowing members of a building and loan association, and executed bonds which required them to make stipulated monthly payments, a stated part being for stock dues, another for interest, and a further sum as premium on the loans. The bond also contained a provision: "Upon final settlement with the association, it to retain as installments on said stock and interests no greater sum than the sum actually advanced with interest thereon at the rate of 8 per cent. per annum." The association became insolvent; defendants having made the required payments to that time. *Held* that, on settlement between them and its receiver under such provision of the contract, the rule of partial payments applied, and defendants were entitled to credit for the full amount of each monthly payment, whether made for dues, interest, or premium.

In Equity. On petitions of receiver for foreclosure of mortgages.

W. D. Ellis, W. A. Wimbish, and T. W. Bacot, for receiver.

S. J. Simpson, J. T. Hay, Haynsworth & Patterson, McCullough & McSwain, Wilson & Wilson, and W. R. Richey, for defendants.

BRAWLEY, District Judge. These are eight separate proceedings in equity for the collection of certain bonds and foreclosure of mortgages, given by the defendants above named, which for convenience have been heard together. The plaintiff is the receiver, appointed in the Circuit Court of the United States for the northern district of Georgia, December 31, 1900, of the Interstate Building & Loan Association of Atlanta, in proceedings in equity commenced by certain stockholders, alleging, among other things, the insolvency of said association, the failure of its plan as a building association, and its inability to continue a going concern. Ancillary proceedings were in due course commenced in this circuit, and the receiver, having duly qualified under the original and ancillary bill, is administering the estate as an entirety. He has filed petitions in this court against the eight defendants above named, separately, praying the foreclosure of certain mortgages. Testimony has been taken, and the case is before me upon the report of Julius H. Heyward, Esq., standing master, and exceptions thereto. The cases have been heard together, and, as there is one question common to all of them, that will now be considered, as it will be practically decisive of all the cases; there being one case, however, in which a separate question was involved, which will be considered in due course. The main question in the cause relates to the credits to be allowed upon the bonds sued on. In the printed argument submitted by the counsel for the receiver it is said:

"It should be observed at the outset, and borne in mind throughout, that these are not suits for foreclosure by a going and solvent building and loan association, under the conduct and control of its own regular officers, elected

according to its own by-laws and rules; but they are equitable proceedings by a receiver of this court, which court is winding up the affairs of an insolvent building and loan association for the benefit of all, and all claims of its shareholders or stockholders."

The question arises upon the construction of a written contract which is somewhat peculiar in the circumstances which gave rise to it, and in its terms, and much of the learning of which the Reports are full, relating to building and loan contracts generally, is of little pertinence. It appears from the statement of the learned counsel for the receiver that these contracts were prepared under the advice of counsel for building and loan associations, with a special view of meeting the objections which had theretofore been urged against the various building and loan contracts, which the Supreme Court of South Carolina had adjudged to be obnoxious to the usury laws of this state. Allusion is made to this feature in an opinion of the Circuit Court of Appeals of this circuit, which will be hereafter referred to.

All of the bonds sued on are on printed blanks, and are of like tenor. Taking the bond of E. A. Young, one of the defendants, as an example, so much thereof as is essential to an understanding of the question will be quoted. Young became the owner and holder of 15 shares of stock in the association in September, 1895, and in October of the same year borrowed from the association $1,500, and as collateral security transferred and assigned his shares of stock to the association, and as additional security mortgaged a certain tract or parcel of land in the county of Kershaw, in this state, which land was subsequently sold to one Smith who continued to make the payments which Young had agreed to make.

After reciting the loan, the bond is as follows:

"Now, the condition of the above obligation is such that if the above bound E. A. Young, or his heirs, executors, or administrators, do well and truly pay or cause to be paid to said association, so long as it shall continue to exist, or as may be provided in its by-laws, rules, and regulations, the sum of $24 monthly (of which the sum of $9 is for installments due on said 15 shares of stock, and the sum of $7.50 is for the interest on the sum actually advanced, and the further sum of $7.50 is for premium on the sum actually advanced), all of which said sums of $24 is to be paid on or before the 1st to the 5th day of each and every month, and shall perform all the covenants contained in the mortgage or other instrument of writing securing this bond, and, if this bond be collected by suit, shall pay the additional sum of 10 per cent. on the amount due as counsel fees, and shall stand to and abide by the by-laws, rules, and regulations of said association (upon final settlement with the association, it to retain as installments on said stock and interests no greater sum than the sum actually advanced, with interest thereon at the rate of 8 per cent. per annum), then this obligation to be void and of none effect; or else to remain of full force and virtue."

It appears from the testimony that all the payments, with dues, interest, and premium, were regularly paid up to January 1, 1901, there being 61 payments of dues, and 60 payments of interest and premiums, and that there were certain payments made after the receivership, which were carried as a ledger credit, and that he was never in default as to his monthly payments. The total amount of such payments appears to be $1,539.

There is a long line of decisions in South Carolina, in building and

141 F.—43

loan cases, beginning with Bollinger's Case, 12 Rich. Eq., 124, 78 Am. Dec. 463, holding that the borrower is entitled to credit on his loan all payments made, whether of stock dues, interest, premiums, in whatever form or guise, and if the aggregate of such payments in any year exceeds the legal rate of interest the transaction was treated as usurious; one of the judges alluding to the monthly payment called "premium" as "simply interest in attempted disguise," and all being treated as modes of payment of the borrower to be credited as of the time of payment, with interest adjusted or calculated according to the rule of partial payments. The Supreme Court of the state, in Gillison's Case, decided in 1887 (28 S. C. 544, 6 S. E. 333), reviews some of these cases, and, referring to the contract then considered, says that it is "of a very different character, and under it in no view of the case could the appellant be required to pay more than the rate of interest allowed by law, and hence there was no usury in it."

Such was the state of the law in South Carolina at the time when, as stated, the building and loan associations, under advice of counsel, prepared a form of contract which would not be obnoxious to the taint of usury, and evidently having in view Gillison's Case, where the court held that there was no usury if in any view of the case the party could not be required to pay more than the rate of interest allowed by law. This form of contract was then adopted, wherein it was provided that the association, upon final settlement, could "retain as installments on said stock and interests no greater sum than the sum actually advanced, with interest thereon at the rate of 8 per cent. per annum"; the law of the state then providing that by special contract 8 per cent. might be charged for the use of money. A similar contract was considered by the Circuit Court of Appeals in Interstate Building & Loan Association v. Edgefield Hotel Company, 134 Fed. 75, 67 C. C. A. 200. In that case the borrower obtained a loan of $6,000, and to do this had subscribed for 120 shares of stock, amounting at par value to $12,000, and had made 74 monthly payments of $102 each; $72 as installment on the stock, and $30 as interest. The court in its opinion says:

"There was, however, inserted in the bond, to meet certain decisions of the courts of South Carolina with regard to usury in building association mortgages, the following important stipulation, namely: 'It is further understood that upon final settlement with the association it shall retain as installments on said stock and interest no greater sum than the amount actually advanced, with interest thereon at the rate of 8 per cent. per annum.' * * * Very little light is obtainable on this question from adjudications in building association cases, as the stipulation by which the settlement in this case is controlled is unusual. It is urged by the appellant that as the monthly installments were not paid in reduction of the loan, but were primarily paid by the hotel company as shareholder, for the purpose of maturing its stock, and not as payments to be applied to its loan, and were payments on shares made as well by those who did not procure loans as by those who did, it is not consistent with justice or the contract of the parties that the installment payments should be applied to the loan. There would be force in this contention if the relation of the hotel company to the building association had remained that of the borrowing stockholder, obliged to continue its installments until its stock matured; but the stipulation that the building association in final settlement should not retain of the installment and interest paid

more than the amount actually advanced and 8 per cent. interest, recognizes that in the final settlement the borrowing stockholder may elect to be treated as a borrower simply, and settle as the borrower would settle with the lender. Without restrictive stipulation the borrowing stockholder might not be able to escape from his relation of stockholder, no matter how many years it might require to mature the stock, nor how excessive the rate of interest might become. To avoid this possible result, and to accord with the decisions in South Carolina, the stipulation was inserted for the borrower's protection in a contract prepared by the building association. Under such a contract prepared by the lender, if there is ambiguity, then by the established rule it is to be construed favorably to the party who, in order to obtain a loan at an exceptional rate of interest, is required to sign a contract, the stipulations of which are prepared by the other party to it. But we do not think that there is any ambiguity. What, under ordinary circumstances, would be the meaning of a stipulation that the lender should not retain out of the payments made to him more than the amount actually advanced with interest at 8 per cent.? It would, we think, be understood to mean that the lender should receive back the money advanced, and, for the use of his money while the borrower had it, 8 per cent. interest, and no more. If in this case the building association should receive the amount advanced, and 8 per cent. interest on it for the whole period of over six years, until the last payment was made, it would have had, in addition to 8 per cent. interest, the use of all the sums which in monthly payments during six years the borrower has paid back, and the use of which the borrower did not have. This would be greatly in excess of 8 per cent. interest. The rule to be applied in such a case between borrower and lender is the rule of partial payments, by which the excess of every payment made over the interest then accrued is applied in reduction of the principal, and the subsequent interest computed on the principal so reduced. Woodward v. Jewell, 140 U. S. 247, 248, 11 Sup. Ct. 784, 35 L. Ed. 478. The stipulation in this case clearly states, in unmistakable language, that out of the installments and interest paid by the borrower the building association shall retain on final settlement no more than the amount advanced, with interest thereon at 8 per cent."

It will be seen that Judge Morris, who wrote the opinion in this case, says that the stipulation above cited recognizes that in the final settlement the borrowing stockholder may elect to be treated as a borrower simply, and settle as a borrower would settle with a lender.

The Supreme Court of South Carolina, in Bird v. Kendall, 62 S. C. 192, 40 S. E. 147, says:

"When a person subscribes for shares of stock and becomes a member of a building and loan association, and thereafter borrows money from the association, pledging his shares of stock to secure its payment, he thereby practically ceases to be a member of the association. The new relation between him and the association is that of debtor and creditor, and it can only recover the principal sum loaned, together with the legal rate of interest."

It will be observed that in the case of the Edgefield Hotel Company the amount credited on the loan was "installments on said stock and interest." There was no premium eo nomine, for in that case the hotel company, in order to borrow $6,000, subscribed for stock of the par value of $12,000, so that his monthly payments were all on account of installments.

In the case of Young his subscription was for 15 shares of stock of the par value of $1,500, and the amount borrowed was $1,500. The monthly payments, by the stipulation of the bond, are "the sum of $24 monthly." Then there follows in parenthesis a statement of the manner in which the $24 is made up, as follows: "(Of which the sum of

$9 is for installment due on said 15 shares of stock, and the sum of $7.50 is for interest on the sum actually advanced, and the further sum of $7.50 is for premium on the sum actually advanced.)" Twelve months' interest at $7.50 per month is $90, which is equal to 6 per cent. on $1,500, and the further sum of $7.50 per month, payable as premium, would make the total annual charge on the loan, exclusive of the installment on the stock, $180, which is 12 per cent. Bearing in mind that the premium had been defined by the courts in South Carolina as "interest under another guise," the draftsmen of this form of contract, doubtless apprehensive that the courts would hold such a contract to be usurious, or that the borrower might not bite at the hook baited for him, undertook to meet this difficulty by providing in the last clause of the bond: "Upon the final settlement with the association, it to retain as installments on said stock and interests no greater sum than the sum actually advanced, with interest thereon at the rate of 8 per cent. per annum."

The referee holds that the final "s" in "interests" is a typographical error, but there is no testimony whatever to that effect. It is at the least highly improbable that the careful and astute counsel for the building and loan association, who prepared this form of bond, would overlook a word of such importance in that clause of the bond which related to the subject on which their opinion was especially asked, to wit, that clause which was to safeguard the contract against the decisions in South Carolina on the subject of interest, and it is therefore more probable that they used the plural noun, so that it might cover not only interest eo nomine, but "interest in the shape of premiums," which the court had already held to be "interest under another guise." If there is any ambiguity, the well-settled rule would require the construction most favorable to the borrower, as against the party who prepared the instrument. But is there any principle upon which payments on account of premium should be differentiated from any other payments made by the borrower? In a going concern it might be contended that payments on account of installments of stock and on account of premium would be considered as payments qua stockholder, and not as borrower simply. It is not necessary to go into all the learning on that subject, where there is a great diversity of opinion; but where the original contract between the association and the borrower cannot be carried out, where the enterprise has been prematurely abandoned, where the default is not with the borrower, but with the lender, the relation between the borrowing member is changed to the one existing between the ordinary creditor and debtor, and the borrowing member is to be charged with the amount actually received by him, with interest at the legal rate to date, and credited with all payments made, whether by way of dues, interest, or premium, according to the rules governing partial payments. I have already cited the case in South Carolina which holds that, where the borrower transfers and assigns his stock to the corporation and obtains a loan from it, his relation is simply that of debtor to creditor, and the opinion in the Edgefield Hotel Case, already cited, is to the same effect, although in that case the building and loan association

was not insolvent.   In Georgia, City Loan, etc., Association v. Goodrich, 48 Ga. 445, supports the view just above stated, and other cases on the same line are collated in 4 A. & E. Ency. of Law, p. 1081.   After all, what is meant by the word "premium," as used here?   Webster's Dictionary gives as one definition of the word:

"Something offered or given for the loan of money, sometimes synonymous with interest, but generally signifying a sum in advance of the capital or sum lent."

Generally speaking, the word, as used in relation to building and loan associations, is the bonus which the borrowing member agrees to pay for the privilege of obtaining the money.   In the beginning of these associations, whenever the association had accumulated a fund, it was put up at auction, and members bid for it, and the difference between the par value of his stock and the actual amount advanced to him was called the premium.   The loan to Young was not made in that way.   He borrowed from the association a sum equal to the par value of his stock, and his monthly payment was the gross sum of $24, a part being for the installment on his stock, a part for interest, and the "further sum," which was called premium.   One can readily understand the contention that a borrower of a building and loan association occupies the dual relation of debtor and shareholder, and that as such it may be plausibly contended that to put the nonborrower and the borrower on the same footing he should be entitled to credit for the amount paid as interest only, and that as to all other payments he should stand in the same relation with other shareholders who are nonborrowers, getting such return as he may pro rata with other shareholders from the dues paid on the value of his stock; but such is not the contention here, for it is admitted that the borrower is entitled to credit on his loan for all payments made by way of installments on his stock, and the learned counsel for the receiver has submitted no argument from which I can draw any distinction in principle between the right of the borrower to credit for the amount paid as installments, and the amount paid for so-called premium.   Their case rests solely upon the decision of the late Judge Simonton in the Alexander Case (C. C.) 120 Fed. 963.   This opinion, in so far as it relates to this question, is in two lines, as follows:

"The words are 'installments on said stock and interest.'   The words exclude the payments on account of premium."

There is no discussion whatsoever of the question now being considered.   So far as appears, the only questions maturely considered were whether the contract was to be construed according to the law of Georgia, or of South Carolina, and whether or not it was usurious. The precise question now under consideration is nowhere discussed in the opinion, which in two lines disposes of the question before him, in holding that by the literal reading of the words of the contract, "installments on said stock and interest," payments on account of premium are not included.   In that contract the word used was "interest"; in this, it is "interests."

While I do not consider that this opinion is absolutely binding and conclusive upon me in any case where I am called upon to exer-

cise an independent judgment, my respect for that learned judge would lead me to gravely doubt the correctness of any judgment differing with his upon a question to which he had given mature consideration and announced a carefully considered opinion. The summary disposal of the question then before him in the two lines quoted does not lead to the conclusion that upon the precise question now to be determined his judgment would differ with my own; for in Interstate Building & Loan Association v. Edgefield Hotel Company, reported in the same volume, page 427, he says:

"In this court, however, the defendant will be allowed to take the most favorable alternative, and to make a final settlement by estimating the amount due on the loan with interest from its date at 8 per cent. per annum, until date of settlement, and credit it with all payments made on account of interest and stock."

Under that rule, where his carefully considered opinion was subsequently affirmed by the Circuit Court of Appeals, the defendants here are entitled to credit for all "payments made on account of interest and stock." If the premium here paid was not on account of interest, or "interest in disguise," it certainly was made on account of stock. In either view it was a payment made on account of the loan, and in the final settlement the lender, by the terms of his contract, is not entitled to receive anything more than the principal loaned, with interest thereon at the rate of 8 per cent. per annum.

If the payments made under the head of "premium" had been segregated and devoted to some specific purpose, there might be some ground for distinguishing such payments from those made on account of installments on stock and interest; but this is not the case. Upon each certificate of stock there is printed certain "terms and conditions." The third is as follows:

"Fifty cents of each monthly payment and all interest, premiums, and forfeitures, shall go into the loan fund, and can be used for no other purpose than loans."

And the testimony of the receiver in these cases is that the "premiums" and "interest" "went to swell the loan fund." These citations from the "terms and conditions" and from the testimony dispose of the contention of plaintiff's counsel, on page 15 of the brief submitted, "that the premiums went into the common venture, while the installments on stock and the interest on the money went directly to canceling the stock and paying the interest, so as to eventually cancel the loan"; for both by the printed rules and in actual practice payments on account of installments on stock, on account of interest, and on account of premiums, went into a common fund, to wit, the "loan fund."

It seems to me clear that all the payments made by the several borrowers in these cases should be credited upon their loans according to the established rules of partial payments, that they became shareholders primarily for the purpose of obtaining the loans, that having complied with all the by-laws, rules, and regulations of the association in making the monthly payments stipulated, and being in nowise in default or chargeable with the premature failure of the associa-

tion, it is entitled upon final settlement by the terms of the contract to "no greater sum than the sum actually advanced, with interest thereon at the rate of 8 per cent per annum."

It follows, therefore, that the report of the referee disallowing payments made as premiums is reversed, and the case is remanded, with directions to state the accounts in accordance with this opinion; and as it is believed that the allowance of the additional credits will show that the loans have been paid in full, it becomes unnecessary to decide whether the plaintiff is entitled to the 10 per cent. claimed as counsel fees. So much of the report of the referee as relates to the cases against Anna E. Hart and C. B. Simmons is affirmed.